UNITED STATES of America ex rel. J. Benjamin JOHNSON, Jr., et al.

v.

SHELL OIL COMPANY, et al.

No. CIV. A. 9:96 CV 66.

United States District Court, E.D. Texas, Lufkin Division.

Jan. 16, 1999.

phrey, Beaumont, Rayford Lee Etherton, Jr., Etherton Smith, John Michael Fincher, Mobile, AL, Reuben A. Guttman, Provost & Umphrey, Washington, DC, Scott A. Powell, Don McKenna, Hare Wynn Newell & Newton, Birmingham, AL, James Burdette Helmer, Jr., Helmer Lugbill Martin & Morgan Co, Cincinnati, OH, for J. Benjamin Johnson, Jr., John M. Martineck.

Claude Edward Welch, John Wesley Tunnell, Law Offices of Claude E Welch, Lufkin, TX, Harold Wayne Nix, Nix Law Firm, Daingerfield, TX, Michael Bryan Angelovich, The Nix Law Firm, San Antonio, TX, for Harrold E. "Gene" Wright.

Carl A. Parker, Parker Parks & Rosenthal, Port Arthur, TX, Wayne A. Reaud, Reaud Morgan & Quinn, Beaumont, Daniel William Packard, Packard & Packard, Beaumont, TX, Von G. Packard, Packard Packard & Johnson, Palo Alto, CA, Lon D. Packard, Packard Packard & Johnson, Salt Lake City, UT, for Leonard Brock, Danielle Brian, Project on Government Oversight.

Olen Kenneth Dodd, AUSA, U.S. Attorney's Office, John Michael Bradford, U.S. Attorney, Beaumont, Robert J. McAulisse, U.S. Department of Justice, Dodge Wells, U.S. Department of Justice, Civil Division, Washington, DC, for United States of America.

George Edward Pickle, Jr., Ann Spiegel, Shell Oil Co. Legal Department, Houston, L. Poe Leggette, Fulbright & Jaworski, Washington, DC, James Stephen Roper, Zeleskey Cornelius Hallmark Roper & Hicks, Lufkin, Daniel M. McClure, Richard N. Carrell, Fulbright & Jaworski, Houston, Brian C. Elmer, Thomas P. Humphrey, Crowell & Moring L.L.P., Washington, DC, for Shell Oil Co., Shell Deepwater Production, Inc., Shell Offshore Ventures, Inc., Shell Oil Products Co., Shell Western Exploration & Production, Inc., Shell Exploration and Production, Inc., Shell Consolidated Energy Resources, Inc., Shell Frontier Oil & Gas, Inc., Shell Land & Energy Co., Shell Offshore Inc.

Thomas T. Hutcheson, Locke Liddell & Sapp, Michael Lee Homeyer, Amoco Corp., Houston, TX, Kenzy Donovan Hallmark, Zeleskey Cornelius Hallmark Roper & Hicks,

Clayton Edward Dark, Jr., Clayton E. Dark, Jr., Attorney, Lufkin, Thomas Walter Umphrey, Michael A Havard, Provost & Um-

Lufkin, TX, Frank Cicero, Jr., Steven Craig Coberly, David J. Zott, Kirkland & Ellis, Chicago, IL, William John Noble, Amoco Corporation, Chicago, IL, for Amoco Co., Amoco Oil Co., Amoco Production Co., Amoco Supply & Trading Co., Amoco Pipeline Co., Amoco Petroleum Products.

Russell Dwight Howell, Conoco Inc., Houston, TX, James Stephen Roper, Zeleskey Cornelius Hallmark Roper & Hicks, Lufkin, TX, Daniel M. McClure, Richard N. Carrell, Fulbright & Jaworski, Houston, TX, George J. Terwilliger, III, McGuire Woods Battle & Boothe L.L.P., Washington, DC, for Conoco, Inc.

Thomas H. Owen, Jr., Burlington Resources Inc., Houston, TX, Taylor Mayo Hicks, Hicks Thomas & Lilienstern, Houston, TX, John T. Boese, Anthony S. Yoo, Fried Frank Harris Shriver & Jacobson, Washington, DC, for Burlington Resources, Inc.

Randall M. Ebner, Exxon Company USA, Houston, TX, Shannon H. Ratliff, McGinnis Lochridge & Kilgore, Austin, TX, for Exxon Corp.

Michael Paul Graham, Baker & Botts, Houston, TX, Russell Dwight Howell, Conoco, Inc., Legal Dept., Houston, TX, James Stephen Roper, Zeleskey Corelius Hallmark roper & Hicks, Lufkin, TX, Daniel M. McClure, Richard N. Carrell, Fulbright & Jaworski, Houston, TX, George J. Terwilliger, III., J. William Boland, Darryl S. Lew, McGuire Woods Battle & Boothe L.L.P., Washington, DC, for Chevron Corp., Chervron, USA, Inc., Chevron Oil Co., Cheveron USA Production Co., Chevron Products Co., Chevron Oil Trading Co., Inc.

Jefferson Gregory Copeland, Rufus W. Oliver, III, Baker & Botts, Houston, TX, Robert J. Pickens, Marathron Oil Company, Houston, TX, for Marathon Oil Co., Marathon Oil Refining Transp. & Marketing, Marathon Petroleum Co.

John Harrell Feldt, Andrew McCollam, Richard H. Page, III, Vinson & Elkins, Houston, TX, James Allen Drexler, UNOCAL, Sugarland, TX, for Union Oil Co. of California, Unocal Corp., Unocal Exploration Corp.

Ronald Earl Cook, Cook & Roach, L.L.P., Houston, TX, Howard J Nichols, Squire Sanders & Dempsey, Cleveland, OH, for BP America, Inc. BP Chemical Inc., BP Exploration & Oil Inc., BP North American Petroleum Inc., BP Oil Co., BP Exploration Inc., BP Exploration (Alaska) Inc., BP Oil Supply Co.

Richard W. Beckler, Fulbright & Jaworski, Washington, DC, James Stephen Roper, Zeleskey Cornelius Hallmark Roper & Hicks, Lufkin, TX, Eric Anthony Allen, Phillips Petroleum Corp, Bartlesville, OK, Daniel M. McClure, Richard N. Carrell, Fulbright & Jaworski, Houston, TX, for Phillips Petroleum Co., Phillips 66 Co., Phillips Oil Co., Kerr–McGee Corp., Kerr–McGee Oil Industries Inc., Kerr–McGee Petroleum Exploration and Production, Kerr–McGee Petroleum Exploration & Production Co., Kerr–McGee Refining Corp.

Tyler Alexander Baker, Fletcher L. Yarbrough, Kenneth E. Carroll, Carrington Coleman Sloman & Blumenthal L.L.P., Dallas, TX, Linda A. Allen, Pennzoil Exploration and Production Co., Houston, John McDonald, Jackson & Kelly, Washington, DC, for Pennzoil Co., Pennzoil Exploration and Production Co., Pennzoil Petroleum Co., Pennzoil Producing Co., Pennzoil United Inc., Pennzoil Products Co., Pennzoil Louisiana and Texas Offshore Inc.

William Raymond Stoughton, Kristen Garvey Schulz, McKenna & Cuneo, Dallas, TX, Taylor Mayo Hicks, Hicks, Thomas & Lilienstern, Houston, TX, Mark R. Troy, McKenna & Cuneo, Los Angeles, CA, Becky McGee, Oryx Energy Company, Dallas, TX, for Oryx Energy Co., Oryx Crude Trading and Transp. Inc.

Max Hendrick, III, James Daniel Thompson, III, Susan Schmidt Pie, Vinson & Elkins, Houston, TX, Claudia Wilson Frost, Baker & Botts, Houston, TX, Oliver S. Howard, M. Benjamin Singletary, Gable Gotwals Mock Schwabe Kihle Gaberino, Tulsa, OK, Peter J. Levin, Pierson Semmes and Bemis, Washington, DC, for Sun Co., Inc.

Claudia Wilson Frost, Baker & Botts, Houston, TX, Oliver S. Howard, M. Benjamin Singletary, Gable Gotwals Mock Schwabe Kihle Gaberino, Tulsa, OK, Peter J. Levin,

Pierson Semmes and Bemis, Washington, DC, for Oxy USA, Inc., Oxy Petrochemicals Inc.

David Richard Woodward, Larry William Johnson, Robert G. Buchanan, Jr., Cowles & Thompson, Dallas, TX, for Canadianoxy Offshore Production Co.

George Edmond Chandler, Chandler Law Offices, Lufkin, TX, Raymond Doak Bishop, Weston C. Loegering, MaryAnn Joerres, Hughes & Luce, Dallas, TX, Darrin M. Walker, Chandler Law Offices, Lufkin, TX, Regina Cooper Himelfarb, Fort Worth, TX, for Union Pacific Corp., Union PAcific Fuels, Inc., Union Pacific Resources Co., Union Pacific Austin Chalk Co., Union Pacific Resources Group Co., Union Pacific Oil and Gas Co.

Roger Neil Moss, Lufkin, TX, Karen L. Manos, Alan M. Grimaldi, Charles J. Engel, III, Kristen S. Scammon, Howrey & Simon, Washington, DC, Bob F. Wright, Domengeaux Wright & Roy, Lafayette, LA, Michael Van Ardoin, Robert K. Hammack, Lafayette, LA, for Texas Inc., Texaco Exploration & Production Inc., Texaco Trading & Transp., Inc., Texaco Oil Trading & Supply Co., Texaco Producing Inc., Texaco Refining & Marketing, Inc., Four Star Oil and Gas Co.

## MEMORANDUM AND ORDER

HANNAH, District Judge.

Before the Court is the Defendants'[1] Rule 12(b)(1) Motion and Memorandum to Dismiss Relators' Claims for Lack of Subject Matter Jurisdiction Pursuant to 31 U.S.C. § 3730(e)(4)(a) (Doc. # 302). Defendants assert that the Court lacks jurisdiction over Relators' *qui tam* action because the action is "based on the public disclosure of allegations or transactions" and that the relators are not the original sources of the information on which the allegations are based. Relators reply that there has been no public disclosure of the allegations or transactions, and alternatively, if the Court finds that public disclosure has been made, that they are the original sources of the information. After reviewing the motions, briefs and materials submitted by the parties, hearing the arguments of counsel, and reviewing the applicable law, the Court is ready to make its ruling.

## BACKGROUND

The Relators have brought this action pursuant to the False Claim Act, 31 U.S.C. 3729 *et seq.*("FCA") against eighteen (18) major oil companies and their divisions, subsidiaries or affiliates, claiming underpayment of royalties owed by the companies to the United States for production of oil on federal and Indian lands.

This action was commenced on February 16, 1996, by the filing, under seal, of an Original Complaint by Relator J. Benjamin Johnson, Jr. Johnson sued to recover penalties and damages arising from the defendants' false statements regarding the royalties owed and/or paid to the United States by the defendants for crude oil produced from Government owned lands. He alleged the defendants had historically underpaid oil royalties to the Government by calculating the royalties using prices substantially lower than the consideration the defendants actually have received for the oil. On July 12, 1996, Johnson filed the First Amended Original Complaint wherein he was joined by Relator John Martineck.

On August 2, 1996, Relator Harrold E. ("Gene") Wright filed a False Claims Act action, under seal, in the Texarkana Division.[2] On June 9, 1997, Realtors Leonard Brock, Danielle Brain, and POGO filed two additional False Claims Act actions, under seal.[3] The Court has previously found that these actions were "related" to the action first filed by relator Johnson and therefore

1. Shell Oil Company; Amoco Corporation; Conoco, Inc.; Burlington Resources, Inc.; Exxon Corporation; Chevron Corporation; Marathon Oil Co.; Union Oil Company of California; Unocal Corporation; BP America, Inc.; Phillips Petroleum Co.; Pennzoil Company; Kerr–McGee Corp.; Oryx Energy Co.; Sun Company, Inc. (R & M); Oxy USA Inc.; Canadian Oxy Offshore Production Company; Union Pacific Corporation and Texaco, Inc., and their various divisions, subsidiaries or affiliates.

2. Cause No. 5:96 CV 243.

3. Cause Nos. 9:97 CV 208 and 9:97 CV 209.

dismissed these relators pursuant to 31 U.S.C. § 3730(b)(5).

On February 18, 1998, the United States elected to intervene in the suit as to Shell Oil Company, Amoco Oil Company, Conoco Inc., and Burlington Resources, Inc. and their various subsidiaries and affiliates.[4] On that date the case was unsealed and was ordered to be served on the defendants.

The live pleading at this point is the Relators' Consolidated and Second Amended Complaint. In the introduction, Relators Johnson and Martineck state that this cause of action arises from a nationwide conspiracy by major oil companies to shortchange the United States of hundreds of millions of dollars in royalties derived from the production of crude oil from federal and American–Indian owned lands spanning more than 27 million acres of off-shore and on-shore tracts located in various states. This alleged underpayment of oil royalties to the United States is accomplished by calculating the royalties based on prices less than the total consideration actually received by the defendants.[5] It is alleged that defendants have filed reports with the United States which cite these deflated prices as the basis for representing the value of the oil upon which the royalties are calculated. Relators claim that "[t]hrough their positions in the oil industry and/or their unique access to information, the Relators have knowledge of the unlawful conduct, including the schemes and practices alleged herein..." which include the following "schemes and practices" which the "[d]efendants have knowingly employed" "in a calculated, concerted effort... to cheat the United States out of its royalty income by deflating the base price of oil upon which royalties are to be paid:"[6]

 (i) misrepresenting that the first sale of oil under buy/sell agreements between themselves and/or other parties is the actual value received for the oil.

 (ii) buying and selling crude oil at the wellhead (to and from each other and other non-Defendant oil producers) at values less than otherwise available to the Defendants with the implicit understanding that, as long as approximately equal volumes are bought and sold, the net financial impact upon any defendant is neutral, so called "overall balancing agreements."

 (iii) using sales to affiliate companies to mask the actual market value of the oil;

 (iv) using an artificially low price for valuing oil when it is refined by the Defendants and never finally sold;

 (v) falsely classifying oil as lower-priced "sour" crude oil, or as oil subject to quality penalties, when such oil is/was in fact higher-valued "sweet" crude oil, or oil not subject to any quality penalties or oil subject to a lesser amount of quality penalties;

 (vi) paying royalties on the basis of lower-priced "sour" crude oil, and then commingling such "sour" crude oil with higher-priced "sweet" crude oil and selling the commingled mass as all "sweet" crude oil commanding a higher price not shared with the United States as royalty owner; and

 (vii) paying royalties on the basis of API gravity penalties, when in fact such oil has been commingled to yield a mixture of oil not subject to API gravity penalties, or oil subject to offsetting API gravity penalties and selling the commingled oil without API gravity penalty, but charging the United States as royalty owner for such non-existent gravity API penalty.[7]

## ANALYSIS

▮▮▮▮] Federal courts are courts of limited jurisdiction and may adjudicate a case or controversy only if there is both constitutional and statutory authority for federal juris-

---

4. Later the Government also intervened against Texaco, Inc. The Government's Motion to Intervene against Unocal and British Petroleum is currently pending.

5. Relators' Consolidated and Second Amended Complaint at page 5 and 6.

6. *Id.* at page 7.

7. *Id.* at pages 6 and 7.

diction. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545 (5th Cir.1981). Statutes which confer jurisdiction on federal courts are to be strictly construed and doubts resolved against federal jurisdiction. *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1067 (5th Cir.1984). It has been held that a qui tam relator "bears the burden of alleging facts essential to jurisdiction and supporting those facts by competent proof." *United States ex rel. Fine v. MK–Ferguson Co.*, 99 F.3d 1538, 1543–44 (10th Cir.1996).

Jurisdiction over the subject matter of this qui tam action is governed by 31 U.S.C. 3730(e)(4)(A)(B) which provides:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative or Government Accounting Office report, hearing, audit, or investigation, or from the news media unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

In deciding the jurisdictional issue we will follow the statutory framework and ask the following questions:

1) whether there has been a public disclosure of allegations or transactions, 2) whether the qui tam action is based upon such publicly disclosed allegations, and, 3) if so, whether the relator is the original source of the information.

*United States ex rel. Federal Recovery Servs. v. Crescent City E.M.S., Inc.*, 72 F.3d 447 (5th Cir.1995) *citing Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562, 565 n. 4 (11th Cir.1994).

*1.) Has there been a public disclosure of the allegations or transactions in this case?*

In determining the answer to this question, the Court is guided by the reasoning in *United States of America, ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645 (D.C.Cir.1994). The *Springfield* Court distinguished between publicly disclosed information and publicly disclosed "allegations or transactions," and held that the FCA only bars suits based on publicly disclosed "allegations or transactions" not information. *Springfield* defined "allegation" as a "statement implying the existence of provable supporting facts" and "transaction" as an "exchange between two parties or things that reciprocally affect or influence one another." *Springfield* originated the oft employed mathematical equation as an analytical framework for use in determining whether or not an allegation or transaction has been publicly disclosed:

[I]f $X + Y = Z$, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed. The language employed in § 3730(e)4(A) suggests that Congress sought to prohibit qui tam actions only when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.

*Springfield*, 14 F.3d at 654.

In analyzing the Relators' Second Amended and Consolidated Complaint, it appears to the Court that it contains allegations of fraud, i.e., that the major oil companies have been underpaying their royalty obligations on oil taken from federal and Indian owned land and that this underpayment of oil royalties to the United States is accomplished by calculating the royalties based on prices less than the total consideration actually received by the defendants. In employing the *Springfield* formula, this allegation of fraud would constitute the "Z" of the mathematical formula. The X and the Y of the formula in this case would be the alleged false state of the facts, that is, the value of the oil used by

the oil companies upon which royalties were paid (the "posted price" or artificially low price) and the true state of facts, that is, the actual value or fair market value they received for the oil taken from federal and Indian lands. *Springfield,* 14 F.3d at 655.

According to *Springfield,* for a matter to be publicly disclosed, *either* Z, the allegations of fraud, *or* X and Y, the essential elements of the fraud, need to be publicly disclosed. *See also United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 740 (3rd Cir.1997) ("It is clear that the FCA's reference to 'allegations or transaction' is in the disjunctive, so that disclosures which reveal either the allegations of fraud or the elements of the underlying fraudulent transaction are sufficient to invoke the jurisdictional bar."); *accord United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 686–87 (D.C.Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997) ("The Act triggers the jurisdictional bar only when there has been a public disclosure of 'allegations or transactions' which it explicitly refers to in the disjunctive.")

■ The basis for this proposition is that if X, an essential element, is in the public domain, and its presence is essential but not sufficient to suggest fraud, the public fisc will suffer when the whistle-blower's suit is banned. However, when X and Y, together surface publicly, or Z, the allegation of fraud, is broadcast, "there is little need for qui tam actions, which would tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue." *Springfield,* 14 F.3d at 654. Qui tam actions are barred when enough information exists in the public domain to expose the fraudulent transactions (the combination of X and Y), or the allegation of fraud (Z). *Id.; accord, United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 741 (3d Cir.1997); *United States ex rel. Rabushka v. Crane Co.,* 40 F.3d 1509, 1514 (8th Cir.), *cert.*

*denied,* 515 U.S. 1142, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995).

■ Further, for public disclosure of the allegations to take place, no specific information or evidence in support of the allegation is necessary. *Springfield,* 14 F.3d at 654–55; *Wang ex rel. United States v. FMC Corp.,* 975 F.2d 1412, 1418 (9th Cir.1992) (all that is required is the disclosure of the allegation, not the proof of it).

Having determined what would constitute the allegation of fraud (Z) and the essential elements of the fraud (X + Y), we next consider the documents tendered by defendants which they allege to publicly disclose either the allegation of fraud or the essential elements of the fraud.[8]

The Court has determined that the following exhibits which meet the statutory requirements as sources of public disclosures, i.e., they are from a criminal, civil or administrative hearing, a congressional, administrative or Government Accounting Office report, hearing, audit, or investigation, or from the news media. § 3730(e)(4)(A).

A. Civil and Administrative Hearings:

1.) The Third Amended Complaint in *Alaska v. Amerada Hess, et al.,* Civ. Action No. 77–84, in the Superior Court for the State of Alaska. (Defendants' Exhibit 12) The allegation at paragraph 35 states "[t]he defendants have not computed and paid, and continue to fail to compute and pay, proper royalties on their oil production by undervaluing their production, and by (unreadable) improper and/or excessive allowances. The defendants have damaged the State by underpaying the royalties due on their oil production."

2.) The Summons and Complaint in *City of Long Beach v. Chevron Corporation, et al,* No. 6538978, filed March 4, 1985. (Exhibit 15) At pages 10 and 11 of the complaint, it is alleged that the defendants engaged in these practices: "(a) Posting prices and establishing royalty (or removal) prices for crude oils

---

8. The defendants have tendered in excess of 130 unindexed documents in support of their motion to dismiss. Some documents clearly cannot be the source of public disclosure in this case, for instance, documents generated after this case was filed cannot be the source of the allegations or transactions.

in California and Alaska at unreasonably low and noncompetitive levels which are substantially below the fair market value of such crude oils;" "(d) Engaging in complicated buy/sell, exchange or other contractual mechanisms to trade among themselves crude oils at their fair market value which conceal from plaintiffs the fair market value of said oil and which maintain the integrity of the prices established by defendants and the price system established by defendants;" "(e) Engaging in reciprocal exchanges, swaps and buy/sells of crude oils which are designed to insure equal value among the defendants for the crude oils exchanged, and which thus eliminate purchase and sale price transactions from the price competition in the marketplace:" "(f) Entering into processing arrangements among themselves and with others, the effect of which is to insure that those arrangements conform to the fair market value of the crude oil to defendants, while at the same time defendants thereby can avoid the use of their own posted or royalty (or removal) prices."

In the second cause of action, it is alleged that, "defendants, individually and as a group, have valued the oil allocated to them under said contracts on the basis of posted prices which defendants know and have known are substantially below the fair market value of the oil, or otherwise have paid to plaintiff prices for plaintiff's crude oil which defendants know or have known are substantially below the fair market value of the oil." At page 15 of the complaint, it is further alleged that defendants "have posted prices for plaintiff's crude oil, or have knowingly adopted the posted prices, or otherwise have paid to plaintiff prices for plaintiff's crude oil which are artificially low relative to other domestic crude oils and foreign crude oils after taking into account appropriate gravity, quality and transportation differentials;" "Defendants, individually and as a group, have engaged in crude oil purchases, sales, exchanges, companion buy/sell arrangements and/or other arrangements in which the defendants paid for and/or valued crude oils among themselves at prices and values substantially above the posted prices and royalty prices for California and Alaska crude oils. These purchases, sales, exchanges, compan-

ion buy/sell arrangements and/or other arrangements concealed from plaintiff and others the fair market value of California and Alaska crude oils and further enabled defendants to avoid among themselves the artificially low price they posted or paid to producers for California or Alaska crude oils."

In the fourth cause of action, it is alleged that, "[d]efendants, individually and as a group, knowing that the prices they posted or paid plaintiff were depressed relative to other domestic crudes and foreign crudes and were substantially below fair market value, have knowingly and falsely represented to plaintiff that the prices posted reflected fair market value and concealed from plaintiff and others the fair market value of California and Alaska crude oils. Each defendant demonstrated its intent to defraud and engaged in fraudulent conduct by the (previously recited) acts and practices...."

3.) The Plaintiffs' First Supplemental, Amended, and Restated Petition in *La Fourche Basin Levee District, et al., v. Texaco, Inc., et al.,* No. 76337, 17th Judicial District Court, Parish of LaFourche, State of Louisiana. (Exhibit 16) At paragraphs 105 and 106, the complaint states, "[o]n information and belief, TEXACO, on its own behalf and/or on behalf of the other Defendants, sold oil produced from DISTRICTS' leases to affiliates or subsidiaries either for TEXACO's own use or for resale at prices substantially higher than the prices on which Defendants based DISTRICTS' royalties." "Defendants failed to share with DISTRICTS the true value of the oil and failed to share the higher prices obtained on resale of the oil by TEXACO's affiliates or subsidiaries."

4.) The "Certain Complainants' Third Supplemental, Amended and Restated Complaint..." in *Sadie Long, et al. v. Texaco, et al.,* No. 92–745, U.S. District Court, Middle District of Louisiana. (Exhibit 17) At paragraphs 97 and 98, it is alleged that, "TEXACO and TEPI, sold oil produced from Certain Complainants' Leases to affiliates or subsidiaries either for TEXACO's and/or TEPI's own use or for resale at prices substantially higher than the prices on which

TEXACO and/or TEPI based Certain Complainants' royalties." "TEXACO and/or TEPI failed to pay royalty to Certain Complainants on the true value of the oil and failed to pay royalty to Certain Complainants on the higher prices obtained on resale of the oil by TEXACO's affiliates or subsidiaries."

5.) The Original Petition in *Texas Land Office, et al. v. Amoco, Chevron, et al.,* in the District Court of Travis County, Texas. (Exhibit 18) At paragraph 19, the complaint states, "[t]he defendants have calculated and made payments on the basis of so-called "posted prices." They have done so as a matter of continuing business practice. As they know, the level of "posted prices" has been (unreadable) below the fair market value of crude oil." At paragraph 20, it is alleged that "[e]ach defendant has received direct benefits from (unreadable) of these depressed prices. Each defendant (or its affiliates) has been able to profit from refining or re-selling or exchanging crude oil for which it did not pay full value."

6.) The Original Petition in *Texas Land Office, et al. v. Union Pacific Resources,* No. 95 CV–241, in the District Court of Fayette County, Texas, filed August 31, 1995. (Exhibit 19) At paragraphs 9 and 10, the petition alleges, "UPRC has calculated and made payments on the basis of so-called 'posted prices.' It has done so as a matter of continuing business practice. As UPRC knows, the level of 'posted prices' has been consistently below the market value of crude oil." "UPRC as set up a marketing subsidiary, Union Pacific Fuels, Inc. ("UPFI"). UPFI purchases crude oil form UPRC (directly or indirectly) and re-sells that crude oil at a profit. UPRC utilizes UPFI to capture the margin between posted prices and the prices that UPFI realizes in the marketplace. UPRC does not pay royalties on that margin."

7.) The Plaintiffs' Original Class Action Petition in *Ken Martin v. UPRC, et al.,* No. 95–CV–214, filed August 25, 1995 in the County Court at Law, Calhoun County, Texas. (Exhibit 20) At page 5 of the petition, it states, "[d]efendants have calculated and made payments on the basis of so-called 'posted prices' as a matter of continuing business practice pursuant to a continuing marketing scheme developed and implemented by the Defendants herein. The level of 'posted prices' has been consistently below the fair market value of the oil purchases. Further, Defendants have imposed fictitious pricing penalties, based on gravity differentials, which do not correspond with the actual market value differences for such differentials in gravity. With respect to certain premium grades of oil, the Defendants have not accorded the price differential to such premium grades of oil which their actual refining and market value requires."

8.) The Complaint in *Carl Engwall, et al. v. Amerada Hess Corporation, et al.,* dated September 1, 1995 in the Fifth Judicial District Court, County of Chaves, State of New Mexico. (Exhibit 21) Paragraph 26 states, "[h]istorically, all of the Defendants made their royalty payments to Plaintiffs and the Class based on each Defendant's 'posted price' for crude oil. The posted price is used by the Defendants for accounting purposes and to reduce royalty and tax payments. The posted prices have no bearing to the actual prices received by Defendants for crude oil." Paragraph 28 alleges, "[d]efendants have paid royalties to Plaintiffs and the Class computed on a price less than the full value received by Defendants for the crude oil upon which the royalties are paid to Plaintiffs and the Class." The next paragraph states, in part, "[d]efendants have not furnished Plaintiff and the Class with true and accurate information setting forth the full value received by each Defendant for the crude oil sold."

9.) The Petition in *Kershaw v. Amoco, et al.,* No. CJ–95–184, filed September 13, 1995 in the District Court in and For Seminole County, State of Oklahoma. (Exhibit 22) Paragraph 21 states, "[h]istorically, oil companies who purchased crude oil paid the so-called 'posted' price, which was published on a daily basis for various oil field locations. Defendants have paid the 'posted' price plus bonuses to producers other than their own production companies or affiliates. Thus, where defendants have purchased crude oil through their production companies and affiliates on leases they own, defendants have

paid the mineral interest owners less than market price."

10.) The June 12, 1987 ruling of the United States Department of the Interior, Minerals Management Service on the appeal of Cities Service Oil from MMS holding. (Defendants' Exhibit 23) At page three: "[i]n the simplest exchange the parties could exchange barrels of crude oil without even assigning a sales price to either the crude oil sent or crude oil received...." and "even though the parties may exchange invoices, the prices assigned to the crude oil may not be equivalent to the fair market value. The parties can assign prices that are half the market value as long as there is a reciprocal undervaluation on the crude oil sent as well as crude oil received. In short, the price used in an invoice for exchanged crude oil, even between unrelated oil companies, is not necessarily the fair market value of the crude oil."

11.) The February 28, 1995 ruling of the United States Department of the Interior, Minerals Management Service on the appeal of Marathon Oil Co. (Exhibit 107.) Marathon Oil Company appealed the order from the MMS which directed it to correct royalty underpayments resulting from its failure to pay royalties on gross proceeds received for oil sold under an exchange agreement between Marathon and Exxon Company. Marathon was ordered to examine all its arm's-length sales of production from all Federal and Indian leases from October 1, 1983 through current sales, to determine the amounts received by Marathon for reimbursements, marketing costs, premiums, and bonuses, and to the extent that those proceeds were in excess of the value on which Marathon paid royalties, to calculate and pay additional royalties. The ruling stated that Marathon sold to Exxon pursuant to an arm's length agreement but receive a "gathering reimbursement" from Exxon in addition to the posted price. In calculating the value of the oil for royalty purposes, Marathon did not include the gathering reimbursement it received from Exxon. Marathon was ordered to pay its royalties on the gross proceeds, whether or not Marathon paid royalties based on the posted price.

B. A Congressional, Administrative or Government Accounting Office Report, Hearing, Audit, or Investigation:

1.) Report of Hearing before the Subcommittee on Mineral Resources and Development and Production of the Committee on Energy and Natural Resources, U.S. Senate, May 23, 1988. (Exhibit 29) At page 1, the report states, "[f]rom 1979 to 1980 or 1981, we in the Congress were alarmed to discover that the reporting of oil and gas royalties from these lands seemed to be inaccurate." At page 66, an assertion is restated: "[b]y the most conservative of estimates, underpayments are staggering. John Simonette, an official with the General Accounting Office which monitors federal programs, told a congressional hearing in April that uncollected royalties 'probably run in the several hundred million dollar range.'" "But the MMS can do anywhere from $300 million to $1 billion a year better, its critics insist." At page 82, a further assertion is stated: "Reports document fraud, waste and mismanagement at every stage of the leasing, royalty-collection and disbursing procedure." At page 95 regarding the cause of underpayments, the assertion is made: "Most of the losses are through underpayments from oil companies that either lie about the amount of oil they take or about its value."

2.) Report of Department of Interior and Related Agencies Appropriations for 1987, Hearing before the Subcommittee of the Committee on Appropriations, House of Representatives., Part 12, Royalty Management. September 25, 1986. (Exhibit 30). At page 178, the following exchange is reported:

Senator Melcher: "The arms' length term is relevant here, but you are talking about the possibility of it being some sweetheart type of a contract."

Mr. Hodel: "For instance, sale by the operator to a pipeline company where there is some kind of interlocking arrangement or other arrangements extraneous to this lease which would compensate for the lower price and would be an excellent opportunity, perhaps not even in any corrupt sense, but an excellent opportunity in which a longstanding working relationship would have the effect of cooling a price."

At page 152 the record reflects that during the hearings, Representative Yates read from a memorandum relating to the West Coast crude oil underpricing:

> Mr. Yates: "The underpricing of West Coast crude oil has been a problem for at least several decades. It has probably cost the state and federal governments hundreds of millions on lost royalty payments.... In simple terms it appears· that major West Coast oil companies assigned prices to the crude oils that were far below real market values. The evidence for this is extensive."

The memorandum read by Rep. Yates includes this statement about bonus markets.

> To answer the obvious question why anyone would fix prices low, it is important to understand that the low crude prices were used by the major companies for only two purposes; buying crude from other people and calculating taxes and royalties. Other firms who purchased crudes were compelled to pay premiums or bonuses over the posted prices.

See page 152 of the report.

3.) January, 1982 Report "Fiscal Accountability of the Nation's Energy Resources" of the Commission on Fiscal Accountability of the Nation's Energy Resources, David F. Linowes, Chairman. (Exhibit 39.) In his introductory letter to James Watt, Secretary of the Interior, Mr. Linowes states, "[d]uring the past six months, the Commission has investigated the serious allegation of massive irregularities in royalty payments due the Federal government, Indian tribes...."

Under the heading "Summary," the report states, "[b]ecause the Federal government has not adequately managed this multibillion dollar enterprise, the oil and gas industry is not paying all the royalties it rightly owes. The government's royalty recordkeeping for Federal and Indian oil and gas leases is in disarray.... [L]arge underpayments... hundreds of millions of dollars due the United States, States and Indian tribes are going uncollected every year."

At page 23, the report states, "[a] major problem is in setting fair market value for oil and gas is that large, vertically integrated companies in effect sell to themselves."

4.) Supplemental Comments of Gray Davis, Controller of California, on the MMS "Revision of Oil Production Valuation Regulations...." 52 Fed.Reg. 1857, January 15, 1987. ·(Exhibit 40) At page 4, the report states that the revised proposal does not respond to the criticisms of the prior Interior practice made by the Linowes Commission, the GAO, and Congress, but seriously exacerbates the problems they noted. Linowes reported that as much as 85% of royalty underpayment was attributable to under-valuation of product by lessees.

Mr. Davis, at page 15, states "[i]n California we have encountered situations in which the price recited in the contract is not what is actually being received because the oil is being traded under exchange agreements." California's audit showed the posted field price of $21.35 bbl. No money changed hands. A "companion" contract existed under which the lessee "selling" at $21.35 was actually receiving oil in exchange "priced" for the purpose of the contract document at $26.80. Thus, what the lessee actually received under its contract was not $21.35 but $26.80. At page 16, Mr. Davis continues, "[s]uch exchange agreements are extremely common in the industry, although their form and detail may vary."

5.) The United States Accounting Office Report to Congressional Requesters "California Crude Oil, An Analysis of Posted Prices and Fair Market Value." September 1988. (Exhibit 48) At page 3, "[t]he issue of whether crude oil posted prices reflect fair market value has been a longstanding controversy in California."

C. News Media:

1.) Los Angeles Times, September 13, 1990, (Exhibit 14) states: "Arco was one of several oil companies named in a lawsuit filed 13 years ago by Alaskan officials who claimed that the companies undervalued the crude oil they had pumped...thus avoiding taxes and royalty payments."

2.) Legal Times, March 1, 1982. (Exhibit 52) The article speaks of the problems of

royalty management by the Department of the Interior and the Report of the Commission on Fiscal Accountability of the Nation's Energy Resources. One of the problems highlighted by the Commission was "undervaluation of oil and gas." The article also states: "[t]he problems the commission identifies are not new or newly discovered. Since 1959, the General Accounting Office and Interior's inspector general have issued at least 11 reports detailing these same problems."

3.) Washington Monthly, April, 1987 (Exhibit 56) addresses the "serious deficiencies in the collection system" regarding royalties from oil and gas taken from federal and Indian lands. "In 1972 the GAO reported that the USGS determined the value of oil and gas by relying on the price the company set—even when that company was selling oil from one subsidiary to the next. Not surprisingly, an examination of only a small fraction of producing wells exposed hundreds of thousands of dollars in royalties lost due to artificially low prices."

4.) Houston Chronicle, May 1, 1990 (Exhibit 57) also addresses the underpayment of royalties stating, "every study that has examined the books has found massive underpayments—deficiencies that cost taxpayers literally billions of dollars. Oil companies regularly undervalue the oil and gas they produce, and the indifferent oversight of the Interior Department's Minerals Management Service assures that the underpayers are rarely caught."

5.) Platt's Oilgram News, April 9, 1991 (Exhibit 58) states, in reference to a report by the Interior Department's Inspector General, "[a]n audit by the department's inspector general has concluded that federal royalties may have been underpaid by at least $76.6—million during the 1980–1989 period because independent oil producers in California have received less-than-fair market value for their oil."

6.) Newsweek, July 18, 1994 (Exhibit 60): "Department of the Interior files obtained by NEWSWEEK charge that seven top oil firms may have underreported the worth of oil drilled on federal land in California by as much as $2.6 billion over 30 years—thus dodging fees of up to $420 million."

7.) Associated Press, Business News Section, March 27, 1984. (Exhibit 61) The article quoted U.S. District Judge William Gray's statement in reference to the California litigation before him: " 'It is evident that the posted prices of heavy crudes were below what the defendant companies considered such oil to be worth and that they were unwilling to exchange (or sell) their heavy oil at a value as low as the posted prices that they paid Long Beach.' "

8.) Associated Press, Business News Section, April 17, 1989. (Exhibit 62) Again, speaking of the California litigation, "[t]he suits accuse the six companies—Standard Oil Co. of California, Texaco, Inc., Union Oil, Mobil Corp., Shell Oil Co. and Exxon Corp.— of holding down the prices they paid for heavy crude oil while agreeing secretly to exchange oil among themselves at higher prices."

9.) Inside Energy/with Federal Lands, December 19, 1994. (Exhibit 63) In discussing the California alleged underpayment of oil royalties: "[a]t issue is whether the oil companies received payments higher than the posted prices, but paid royalties on the lower, posted value."

10.) The Oil Daily, September 29, 1986 (Exhibit 64) examines the statements of Rep. Sidney Yates, "whose Appropriations Interior Subcommittee control the department's purse strings, said he is so 'appalled' at the continued under-reporting or royalties and the slow pace of reforming the collection system...." "Yates also complained that much of it might be due to 'under pricing' of the value of the oil or gas brought on by one company selling to its own subsidiary or parent at a low price for the precise purpose of minimizing the royalty obligation."

11.) United Press International, October 5, 1981 (Exhibit 68) discusses the findings of the Linowes Commission which investigated oil theft and royalty underpayment from federal and American Indian lands. Among the problems the commission found in their investigation was "under valuing, by reporting the correct amount but a poorer grade of oil than actually is received...."

12.) Project on Government Oversight Press Release, April 1995, entitled "Department of Interior Looks the Other Way: The Government's Slick Deal for the Oil Industry" (Exhibit 87) quotes the United States D.O.I. Minerals Management Service—"We have evidence that the major California oil producers may have undervalued California oil production by keeping posted prices low and thus underpaying the royalties based on them.... The various available court documents, out-of-court settlements, discussion with attorneys, and the work of consultants lead us to conclude that we should pursue potential Federal royalty underpayments."

13.) The Oil Daily, May 4, 1995 (Exhibit 109) addresses the underpayment of royalties in California and says, "[i]ndependent producers in California have at times referred scornfully to the majors' posted prices as a completely artificial means of establishing crude values. The doubts especially focus on transfers from a major's crude unit to its refining unit—the transactions that are not at arm's length."

14.) Santa Fe Reporter, June 14, 1995 (Exhibit 117), in discussing the valuation problem states, "By tradition, large oil companies have paid their taxes and royalties to the government based on the so-called 'posted price' of oil—which is set by the big producers.... 'They [posted prices] had no basis in reality' says Gary Carlson, assistant New Mexico land commissioner for mineral resources." "Most economists and government officials now use the prices set by traders on the New York Mercantile Exchange as the prevailing value of the oil. Oil producers, however, continue to pay royalties on the lower posted price, which they themselves have set."

### Discussion

The Relators argue that public disclosure cannot be found unless all of the defendants are named, the fraudulent conduct in the disclosure is alleged as to specific defendants and as to specific geographical areas, that the specific time frame alleged in their complaint must be included, and the disclosure must regard a federal oil lease. Relators point to the elements they must prove in order to prevail.

■ The FCA does not require this degree of detail in the public disclosure. *See Springfield,* 14 F.3d at 654–55. The Court agrees with *Springfield* that to bar the qui tam suit, the information required in the public disclosure must be "sufficient to enable [the government] adequately to investigate the case and to make a decision whether to prosecute." *Springfield,* 14 F.3d at 654.

■ From the above exhibits, Defendants have demonstrated that enough information existed in the public domain at the time the suit was brought to expose the allegation of fraud (Z). *Id.* at 654–55; *accord, Dunleavy,* 123 F.3d at 741; *Rabushka,* 40 F.3d at 1514. Whether the information in the public domain is sufficient to expose the essential elements $(X + Y)$ of the fraud is more problematical. Because the cases hold that *either* the allegations of fraud *or* the essential elements of the fraud need be in the public domain for there to be a finding of public disclosure, we need not decide that issue to hold that the public disclosure has occurred in this case.

The Court finds that the public disclosure of the allegations of fraudulent conduct of the defendants should have set the government squarely on the trail of the alleged fraud without the assistance of relators. *Springfield,* 14 F.3d at 655. The allegations of fraud were clearly in the public domain well before Relators filed their suit.

*Is this qui tam action based upon the publicly disclosed allegations?*

Having found that there has been a public disclosure of the allegations in this case, the next inquiry is whether the Relators' suit is based upon those public disclosures.

The statutory term "based upon" has been variously defined by the circuit courts. The Fourth Circuit has interpreted "based upon" to mean that the relator's knowledge of the fraud must be actually "derived from" the prior public disclosure. *United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339 (4th Cir.), *cert. denied,* 513 U.S. 928, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994). The other circuits, including the Fifth Circuit, have been more comprehensive in their view of

this term, holding "based upon" to mean the allegations in the complaint are "supported by" or "substantially similar to" the publicly disclosed allegations or transactions, regardless of whether or not the relator was aware of the public disclosure. *See United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc.,* 123 F.3d 935, 940, cert. denied, —— U.S. ——, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998) ("In construing 'based upon' to mean 'supported by' we effectively preclude individuals who base any part of their allegations on publicly disclosed information from bringing a qui tam action"); *FPC–Boron Employees' Club,* 105 F.3d at 683, cert. denied, —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997) ("the jurisdictional bar ... encompass[es] situations in which the relator's complaint repeats what the public already knows, even though she had learned about the fraud independent of the public disclosures").

In *Federal Recovery Services,* 72 F.3d at 451, the Fifth Circuit did not expressly define the term "based upon" but relied upon *Wang ex rel. United States v. FMC Corp.,* 975 F.2d 1412 (9th Cir.1992). *Wang* held that the relator's complaint was "based upon" a prior public disclosure by applying the "supported by" rationale. The Court went on to quote *United States ex rel. Precision Co. v. Koch Industries, Inc.,* 971 F.2d 548, 552 (10th Cir.), cert. denied, 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993) which held that "an FCA qui tam action *even partly based upon* publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transaction." *Federal Recovery Services,* 72 F.3d at 451. (Emphasis in the original.) The opinion also looked kindly upon the 11th Circuit's reasoning in *Cooper,* 19 F.3d at 567 which held that 31 U.S.C. § 3730(e)(4) "preclude[s] suits based in any part on publicly disclosed information."

 Relators argue that the public disclosures do not include a crucial element of their case, that is, the false filing of the MMS Form 2014 as the basis for this FCA case. Their argument is without merit.

A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed.... If a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a qui tam action cannot proceed.

*FPC–Boron Employees' Club,* 105 F.3d at 688.

Applying this reasoning to Relators' allegations and transactions and the nature of the public disclosure in this case, we find that the allegations are "based upon" publicly disclosed information. Relators' complaint "repeats what the public already knows, even though [they may have] learned about the fraud independent of the public disclosures." *Id.* at 683.

*Are the Relators original sources of the information?*

31 U.S.C. § 3730(e)(4)(B) provides:

(b) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

 To qualify as an original source the Relators must have "direct" and "independent" knowledge of the information on which the allegations are based. Direct knowledge has been found to mean first-hand knowledge of the material elements of the alleged fraud which the relator has gained through his "own efforts and not acquired from the labors of others." *United States ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1006–07 (10th Cir.1996): *Federal Recovery Services,* 72 F.3d at 452 (relator did not have direct knowledge regarding allegations, which had been the subject of two prior state court proceedings, because the material was disclosed before the corporate relator existed and the information it obtained after it was created was "the product and outgrowth of the information that others had obtained prior to [relator's] incorporation") *see also FPC–Boron Employees' Club,* 105 F.3d at 691 (D.C.Cir.), cert. denied, —— U.S. ——,

118 S.Ct. 172, 139 L.Ed.2d 114 (1997) (relator, who gained his knowledge of the allegations in the complaint from his attendance at a meeting, did not have "direct" knowledge, his knowledge was not "firsthand"); *United States ex rel. Devlin v. California*, 84 F.3d 358, 361 (9th Cir.) *cert. denied*, — U.S. ——, 117 S.Ct. 361, 136 L.Ed.2d 252 (1996) (relators, who learned of defendant's wrongdoing from an insider and conducted an investigation to confirm the allegations, did not have "direct" knowledge because "they did not see the fraud with their own eyes or obtain their knowledge of it through their own labor unmediated by anything else"); *Wercinski v. IBM Corp.*, 982 F.Supp. 449, 461 (S.D.Tex.1997) (relators, who were auditors, did not have "direct" knowledge because the allegations regarding defendant's billing practices were the result of a previous audit performed by another individual, relators did not "obtain knowledge ... through their own labor, but rather learned it secondhand....");*United States ex rel. Koerner v. Crescent City E.M.S., Inc.*, 946 F.Supp. 447, 453 (E.D.La.1996) (relator, who learned of defendant's alleged misconduct from a former employee of the defendant, did not have "direct" knowledge because relator "was neither a close observer of or otherwise involved in the fraudulent activity which is the subject [of] his complaint").

"Independent" knowledge is "knowledge that is not itself dependent on a public disclosure." *Springfield*, 14 F.3d at 656. It has also been defined as knowledge which is not "derivative of the information of others...." *Advanced Sciences, Inc.*, 99 F.3d at 1006–07.

We are aware that the Second and Ninth Circuits have added a third prong not contained in the False Claims Act, to the definition of "original source." In these circuits, the relator also must be the source of the information that was publicly disclosed. *See Wang*, 975 F.2d at 1419 (9th Cir.1992) (stating that "all those who 'directly or indirectly' disclose an allegation might qualify as its original source"); *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir.1990) (stating that relator must be "directly or indirectly ... a source to the entity that publicly disclosed the allegations on which [the] suit is based"). The Fourth and Eleventh Circuits have squarely rejected this addition of the extra statutory requirement. *See Siller*, 21 F.3d at 1351, 1355, *cert. denied*, 513 U.S. 928, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994) (stating that a qui tam plaintiff need not be a source to the entity that publicly disclosed the allegations on which the qui tam action is based to be an original source because there is no need or justification for imposing an additional, extra-textual requirement not intended by Congress); *Cooper*, 19 F.3d at 568 n. 13 (11th Cir.1994) (stating that this extra requirement would impose a tough burden on the relator and could discourage citizen involvement, even when the citizen has direct and independent knowledge of fraud) The Court of Appeals for the District of Columbia, while agreeing with *Siller* in rejecting the extra textual requirement, added a temporal requirement that the relator must have come forward with the information prior to the disclosure. *FPC–Boron Employees' Club*, 105 F.3d at 690 (D.C.Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997).

The Fifth Circuit has not addressed this issue. We agree with the reasoning of the Fourth, Eleventh, and District of Columbia Circuits and reject this addition of the extra statutory requirement. We decline to follow the District of Columbia Circuit's lead in adding a temporal requirement as this extra requirement could discourage citizen involvement, even when the citizen has direct and independent knowledge of fraud.

*Relator J. Benjamin Johnson:*

■ From the deposition and affidavit of Relator Johnson, we learn the following about Johnson's knowledge of the allegations and transactions alleged in the complaint and his methods for obtaining this information. Mr. Johnson is a petroleum engineer who began his professional career in 1979 working for Atlantic Richfield Company (ARCO). For the greater part of time from 1979 until November, 1993, Johnson worked for ARCO at various locations, including Anchorage, Alaska, Lafayette, Louisiana, Dallas, Texas, and Bakersfield, California. In January, 1991, he became ARCO's Area Manager of Crude Oil Marketing for the eastern United

States. He managed all aspects of the purchase, sale, and trade of oil in the eastern United States. These transactions formed the basis upon which ARCO paid its royalties. In this position, Johnson was also responsible for reviewing crude oil marketing trends and general industry marketing functions throughout the United States.

While at ARCO, Johnson dealt personally with representatives of every defendant to construct and implement domestic crude oil marketing arrangements east of the Rockies. He became familiar with the various types of oil marketing arrangements employed by almost all of the major oil companies. He observed that although the competition between companies for maximizing their own crude oil value was most intense, there were certain accepted unwritten rules and general practices that were followed by all crude oil traders if they wanted to maintain their successful negotiating relationship with the traders from other companies. These rules included basic practices for not cheating each other but also included some "shadowy" practices that provided each company the ability to mask crude oil value used in the payment of royalties and severance taxes. He observed the "added value" given by the oil companies for the oil, which both contract parties understood was greater than the actual contract price. Through the actual negotiation and execution of proprietary marketing arrangements, Johnson directly saw the full value defendants received for their oil.

While at ARCO, Johnson monitored the amount paid by other oil companies to ARCO on federal leases. The ARCO business records demonstrated that the lease price set by defendants was consistently below the true actual value of the federal crude oil. Johnson gained first hand knowledge of defendants' royalty payment prices as a result of his review of ARCO's receipts from defendants on the same lease locations. In his position at ARCO, Johnson was familiar with the "common purchaser laws" which required that the same price be paid to all parties with interest in the same land.[9] Therefore, he could deduce the value of the oil which the defendant companies were declaring.

Another area of direct observation concerned the sales of crude oil to small, independent refineries. Under 43 U.S.C. § 1337(b)(7), 20% of the crude oil from certain offshore leases must be made available to small, independent refineries at the same price upon which federal royalties are paid. Mr. Johnson had numerous contacts with small, independent refineries who wanted oil that ARCO had pumped from these federal leases, so called "set-aside" oil, at posted prices which were below market value. In this position, as ARCO negotiator, he learned that the independent refineries could buy from other major oil companies sold at the posted price, which, again, was less than the value of the oil.

In late 1993, Relator Johnson, along with Relator Martineck, voluntarily left ARCO to form Summit Resources, Inc., where he currently serves as Chief Executive Officer. The purpose of Summit Resources, Inc. is to help independent oil producers and royalty owners recover full value for their oil. In this position, Johnson reviewed thousands of royalty payments and compared them to the prices which he knew, from his experience at ARCO, the oil companies had truly received. Johnson reviewed payments from over 50 oil companies, including every defendant in this case. Johnson knew from his personal experience that the standard industry practice was to include both federal and private leases on the same crude oil marketing contracts. Many of the properties Mr. Johnson analyzed for private royalty owners also included royalty interests held by the government. Again, Johnson saw that defendants were underpaying their royalties to private parties and the government.

Johnson also assisted an independent refiner in developing a bid to purchase federal royalty oil through the MMS Royalty In Kind ("RIK") Program. Under this pro-

9. *See, e.g.,* Tex. Nat. Res.Code Ann. § 111.086(a) (West 1997): "A common purchaser shall purchase oil offered to it for purchase without discrimination in favor of one producer or person against another producer or person in the same field and without unjust or unreasonable discrimination between field in this state."

gram, the MMS was selling a portion of federal royalty oil to qualified small independent refiners at the same price upon which defendants had paid federal royalties. He determined from his previous experience, that this oil was priced lower than the value he knew the oil companies had received for the oil.

From the above, the Court concludes that Relator Johnson has direct and independent knowledge of the material elements of the alleged fraud which he has gained first-hand through his "own efforts and not acquired from the labors of others." *United States ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1006–07 (10th Cir.1996). His knowledge is independent. It is not, itself, dependant on the public disclosure. *Springfield,* 14 F.3d at 656.

*Relator John M. Martineck:*

Relator Martineck's deposition and affidavit indicate the following about his knowledge of the allegations and transactions alleged and his methods for obtaining this information. Relator Martineck, is currently president of Summit Resources Management, Inc., which he founded along with Relator Johnson in 1993. Martineck also was formerly employed by ARCO. He has a B.B.A. degree in Accounting. He started his career at ARCO in May of 1981 in ARCO's Accounting Development Program and performed various other functions for the company. From December 1990 to December 1993, he was ARCO's Crude Oil Marketing Manager for the Central District, which included crude oil production in West Texas, New Mexico, Oklahoma, Kansas and the Rocky Mountain states. These areas included large federal and Indian lands.

From April 1986 to March 1988, he was ARCO's Crude Oil Marketing Manager for the Southern and Southeastern Districts which concerned the geographic area of the Offshore Gulf of Mexico, Louisiana, Mississippi, South and East Texas. His position, like that of Mr. Johnson, included daily communications and intense negotiations with the representatives of other oil companies, particularly concerning negotiations on buy/sell exchanges and balancing of volumes on

buy/sell contracts where he learned much of the same information as did Relator Johnson.

In his position in ARCO's Crude Oil Marketing Department, in addition to learning about the practices enumerated above in the discussion regarding Relator Johnson, Martineck continued the responsibilities from his previous accounting position of reconciling the difference in the account receivables established on oil properties, including federal lands. He personally wrote computer reports that extracted information from the marketing and accounting systems that monitored how ARCO was receiving funds based on the marketing arrangements. Through these reports, he learned of the payment practices employed by other oil companies, including all of the defendants in this lawsuit. He personally recorded the oil revenues received from other oil companies, including all of the defendants in this lawsuit with respect to ARCO's royalty and working interest. He personally established the accounting master files that were the basis on which all oil revenues were recorded and paid by ARCO. This experience gave him first hand knowledge of what other oil companies were paying to ARCO on Federal and Indian properties, as well as private properties. His direct research on ARCO's receipts from other major oil companies proved that the payment practices of the major oil companies east of the Rockies were the same across the board for both Federal, Indian and private properties.

Martineck's duties also included the administration of crude oil marketing values for ARCO's lease crude oil which had been purchased by other oil companies. He personally calculated the value paid by other oil companies, including all of the defendants, to ARCO for ARCO's working interest and royalty oil. Because he had personal knowledge of the actual marketing practices, he determined that the defendants were not paying ARCO the full value they had received for the oil. This practice was systematic and widespread but also extremely well disguised. He learned that the structure of the oil marketing contracts themselves provided misleading accounting records which, if one did not have access to the actual complete

marketing arrangements, would lead auditors and outside parties to the mistaken conclusion that full value had been paid. He learned that it was standard procedure, and in some states, required by law, to pay all parties on the same property the same price for the crude oil. Because he saw the other companies had paid ARCO less than full value, he knew that they had to be paying their own royalties at values less than the full value they had received.

In his position with Summit Resources, Inc., Mr. Martineck made personal review of thousands of confidential private royalty payments for their clients. These included payments from over fifty different oil companies, including every defendant. He confirmed through his personal analysis of these royalty payments that the royalties that had been paid by the defendants, and others, were paid on a systematically low price. Most had been paid at the "posted price" which was below the actual value received by the oil companies. This experience confirmed his previous conclusions. Because many of the properties he analyzed included portions of federal lands and royalty payments from offshore federal leases where overriding royalties and working interests were paid based on the amount paid to the federal government, Martineck confirmed that the defendants were underpaying their royalties based upon the actual full consideration they were receiving for the oil.

Through these positions with ARCO and in his position as president of Summit Resources, Inc., Mr. Martineck made direct, first-hand observations concerning the practices of the defendants regarding the actual value they received for the oil pumped from federal and Indian lands as opposed to the value they were reporting for royalty and tax purposes.

The Court likewise finds that Relator Martineck's knowledge is direct and independent of any public disclosure made in this case.

*Disclosure to the Government*

The record also indicates that Relators Johnson and Martineck voluntarily disclosed their knowledge and information to the Government well before they filed this suit. This was first done at the May 27, 1994 Western States Land Commissioners Association ("WSLCA") in Cheyenne, Wyoming. Relators met with Walt Rosenbusch, Special Assistant to the Assistant Secretary of the U.S. Department of Interior and described to him their personal knowledge of the royalty underpayments and provided a written report. Relators provided specific examples, based upon their personal experience at ARCO of certain undervaluation schemes. Relator Johnson again spoke to a large WSLCA meeting on May 5, 1995 in Denver, Colorado where members of the D.O.I. MMS division were in attendance. Johnson presented further illustrations of the Defendants' actual underpayments and provided a copy of his report to the MMS representatives. Since the May 1994 meeting with Mr. Rosenbusch, Relators have continued to educate and assist the Government in this matter.

Relators status as original sources of this information to the Government is reflected in the following words of Mr. Rosenbusch's memo to Bob Armstrong, Assistant Secretary for Land and Mineral Management, dated May 31, 1994. Mr. Rosenbusch states:

At the WSLCA Royalty Management Conference meeting an interesting item was on the agenda. A consulting firm [Summit Resources, Inc.] made a presentation that described the potential underpayment of federal and state royalty on crude oil. The consulting firm was started by two former ARCO Crude Oil Marketing Specialists who know from personal experience what integrated oil companies are doing in terms of maximizing revenue ($.50 to $2.50 per bbl) but not including the additional value for royalty or severance tax purposes. I believe there is additional value out there on crude oil based (sic) my experience in marketing crude oil at the TCLO.

I will be meeting with this consulting firm next week when I am in Dallas visiting the MMS audit office. Based (sic) my meeting next week, I intend to develop an (sic) document that will lay out what I believe are our opportunities to work with this firm in developing audit procedures and/or

other support in collecting the additional federal royalty due on crude oil.[10]

In addition to the above, the Relators provided the Government with Statements of Material Evidence which were provided to Janet Reno, Attorney General, days before filing the suit.

For the above reasons, the Court finds that both Relator Johnson and Relator Martineck are original sources who have direct and independent knowledge of the information on which the allegations are based and that they have voluntarily provided the information to the Government before filing this action under the False Claims Act. 31 U.S.C. § 3730(e)(4)(B). Accordingly, the Court has jurisdiction over Relators' case. 31 U.S.C. § 3730(e)(4)(A).

IT IS THEREFORE ORDERED that the Defendants' Rule 12(b)(1) Motion to Dismiss Relators' Claims for Lack of Subject Matter Jurisdiction Pursuant to 31 U.S.C. § 3730(e)(4)(A) (Doc. # 302) is DENIED.

10. Interoffice Memorandum, Office of the Assistant Secretary for Land & Minerals Management,

Relators' Exhibit 1.